RANDOLPH BUILDING CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8701–73.   Filed February 15, 1977.

*Warren C. Seieroe, Clinton Krislov, Morris Glasser,* and *Richard Stone,* for the petitioner.
*Seymour I. Sherman,* for the respondent.

WILBUR, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| TYE Aug. 31— | Deficiency | TYE Aug. 31— | Deficiency |
|---|---|---|---|
| 1968 | $70,669.63 | 1970 | $1,417.02 |
| 1969 | 57,611.24 | 1971 | 59,155.57 |

Due to concession by the parties, the sole issue remaining for decision is the proper amount of depreciation deductible by the petitioner in the years in issue with respect to property purchased by it in 1967. This requires us to apportion the purchase price paid by petitioner for real estate between the land and physical improvements thereon.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is an Illinois corporation with its principal office and place of business at all times here pertinent at 32 West Randolph Street, Chicago, Ill. It filed timely corporate income tax returns for the fiscal years ending August 31, 1968, and August 31, 1969, with the District Director of Internal Revenue at Chicago and for the fiscal years ending August 31, 1970, and August 31, 1971, at the Midwest Service Center at Kansas City, Mo.

On September 1, 1967, petitioner purchased improved real property in the downtown or "loop" area of Chicago for a total purchase price of $1,918,000. Various capitalized costs were incurred and the total original cost basis was $1,924,198.50. The real estate firm of L. J. Sheridan & Co. (Sheridan) of Chicago acted as broker in the foregoing transaction. Shortly thereafter, petitioner retained Sheridan to manage the real property.

The site on which the building is located is a primarily rectangular-shaped parcel in Chicago's central business district. The site has a frontage of approximately 140 feet on W. Randolph Street, a depth of 180 feet, and an alley width of approximately 163 feet which gives it a slight "L" shape. The total land area is approximately 27,747 square feet.

The building, which is commonly known as either the Oriental Theatre Building or the Civic Tower, is a multifunctional commercial property of structural steel and concrete construction built in 1926. The front section (the tower) is 22

stories in height. The first floor of the front tower section contains the theater entrance, an entrance to a basement restaurant, and stores which also occupy part of the second floor. The upper parts of the tower section contain about 70,000 square feet of commercial office space. The 16-story rear section contains a 3,164-seat theater which occupies the first 7 floors. The 8th floor over the theater is a service and storage area. The remaining 8 upper floors are occupied by meeting halls on the 9th, 10th, 12th, and 14th floors. The 10th and 12th floor halls are of two-story height, while the 14th floor is a large auditorium of three-story height. These 3 floors all have mezzanines.[1] The 4 meeting hall floors each contain about 15,000 square feet of potentially rentable floor space exclusive of mezzanine areas, or a total of 60,000 square feet.

The building had produced little or no net income prior to the date of petitioner's acquisition. The direct costs of demolishing the building and putting the land in a vacant state on September 1, 1967, would have been $825,000. Wrecking would have taken about 6 months and the other expenses (including lost income) would have added $100,000 to demolition costs, making a total of $925,000. Petitioner did not, however, demolish the building. Instead, following its acquisition of the property petitioner made various capital improvements to the building in the amount of $1,961,148.20.

On its returns for the years in issue petitioner allocated $1,348,878.50 of the purchase price to the physical improvements. The petition filed in this case sought allocation of $1,596,700 to the physical improvements. On brief, petitioner contends that $1,341,551 of the original cost basis is allocable to the physical improvements.

Respondent, on the other hand, asserted in the notice of deficiency that $342,198.50 of the cost basis is allocable to the physical improvements. At trial and on brief respondent contends that $463,539.50 is allocable to the physical improvements.

### OPINION

The sole issue for decision is the proper amount deductible by petitioner for depreciation during the years in issue with

---

[1] There are no 11th, 13th, 15th, or 16th floors, except mezzanines.

respect to the Oriental Theatre property. The resolution of this issue depends on the basis attributable to the building located thereon, which in turn depends on the allocation of the purchase price between the land and the depreciable improvements located thereon.

The basis for depreciation of the improvements must bear the same proportion to the lump-sum purchase price "as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time." Sec. 1.167(a)–5, Income Tax Regs.[2] Thus, our inquiry focuses on the value of the property at the time of the acquisition as well as the value of the component parts, i.e., land and building.

Petitioner contends that the value of the entire property on September 1, 1967, was $2,170,000 and that the value of the depreciable property was $1,513,000. Respondent, on the other hand, argues that the value of the property was $2,200,000 and the value of the depreciable improvements was $530,000.

Thus, there is only slight variation in the positions of the parties on the value of the entire property. Similarly, the value of the land as vacant generates little disagreement. The principal dispute is whether the value of the land should be diminished and the value of the building increased by estimated demolition costs of $925,000. This dispute accounts for the wide disparity in value allocated to the depreciable improvements by each party.

In determining the value of the land, the expert witnesses for both parties considered the location of the site, the highest and best use of the land,[3] and comparable prior sales of property in the central business district. While the experts agreed on a basic value of $60 per square foot, petitioner's expert adjusted the value to $57 per square foot to reflect the reduced frontage of the parcel resulting from the slightly irregular shape. The total value of the land on the basis of the $57 valuation is $1,582,000 and on the basis of the $60

---

[2] Sec. 1.167(a)–5. Apportionment of basis.

In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * * *

[3] Both experts agreed that the highest and best use of the property was as a continuing commercial property.

valuation, $1,670,000. Since petitioner's valuation of the land takes into account the peculiar shape of the parcel and its reduced frontage, we believe petitioner's valuation of the land to be more accurate than respondent's.

As noted, however, petitioner urges us to reduce the land value by the current estimated costs of demolition, to allow for the demolition of the building, and to put the land in the vacant state (at which it was valued) at the end of the assumed 20-year life of the improvements. Petitioner begins by stating that the value of income-producing property must, on the particular facts before us, be determined by capitalizing the projected earnings over the life of the property, assuming reasonable interest rates and appropriate discounting to arrive at present worth. The capitalization method assumes that the present value of the income stream from the property plus the present value of the property at the end of the estimating period will be sufficient to provide *both* a return of *and* a fair return on the capital invested. Respondent has no serious quarrel with petitioner's calculations on this point.

Additionally, however, petitioner argues that a key ingredient in this formula—the value of the property at the end of the estimating period—cannot be considered unless we recognize that at the end of this period, the current building will have to be demolished. Therefore, petitioner urges us to reduce the land value by the estimated cost of demolition, to allow for the demolition of the building to put the land in a vacant state at the end of the assumed 20-year life of the improvements.

To the extent demolition is imminent, a prospective buyer would certainly take into consideration the demolition costs that must be incurred within the very near future—say 3 months, 6 months, or a year. Petitioner argues that the economic principle is no different if the demolition costs to be incurred are 1 year, a few years, or in this case, 20 years into the future; the principle in all of these instances is the same, and one need only adjust the anticipated future demolition costs to determine their present worth.

Respondent, on the other hand, contends that it is improper to take theoretical demolition costs at some future date into account; that even if it were appropriate, potential demolition

costs should reduce the value of the building, not the land; and that to adopt petitioner's theory leads to absurd results.

Thus both parties agree that the highest and best use of the entire property required retention of the building, since it added significantly to the vacant-state value of the land. How much the building adds is the only real question and resolution of this question turns on whether the hypothetical demolition costs of some future time should be accounted for now, and if so whether they reduce the value of the land or the building. Both parties have filed excellent briefs making the very most of their respective positions. Nevertheless, petitioner had the short end of the argument. We do not believe that land value should be decreased and the value of the building correspondingly increased by estimated demolition costs. Demolition costs, even if it were appropriate to take them into account on the facts before us, would diminish the value of the building rather than the land. For the following reasons, we hold for respondent.

The task before us is to allocate the purchase price between the land and the buildings on the basis of their relative market values. Due to transfers of comparable land, the value of the land can be estimated with reasonable accuracy, and the difference between the value of the land and the value of the entire property can be attributed to the building.[4]

It may help to understand the problem before us by considering a vacant building site that is purchased for $1 million. A building is erected at a cost of $2 million that is designed to exploit the full income-producing capacity of the site to its maximum potential. The entire property is worth $3 million.[5] As the building ages and obsolescence occurs, the value of the entire property diminishes, although since the

---

[4] This method is known as the building residual technique. See Kinnaid, Income Property Valuation 237–252 (D.C. Heath 1971). Respondent squarely relies on this physical residual technique of income capitalization, and except for the adjustment for demolition costs, we do not perceive petitioner's method to have been measurably different, although various corroborating calculations of the basic assumptions were also offered.

[5] At this point the present worth of the income stream plus the present worth of the reversion (assuming market interest rates in both instances) over the estimating period (useful life of physical improvements) would equal $3 million. Also, the building residual (or indeed land residual see Kinnaid, *supra* at 247) method would result in land value of $1 million and the physical improvements would have a value of $2 million.

building adds significantly to the income-producing potential of the land as vacant, retention of the building is still the highest and best use for the property. As further age and obsolescence occur, the value of the property diminishes further. Yet the land remains constant, and only the building is changing. Can the reduction in value be attributable to anything other than those variations in the building?

As we reach the point where the building adds nothing to the value of the land as vacant—where the income stream provides only a fair return on the value of the land (or put conversely, where the income stream as capitalized equals only the value of the vacant site)—the value of the physical improvements may fairly be said to have reached zero. All of this time, it is the physical improvements that are declining with a commensurate decrease in the value of the entire property.

Continuing further, when the return from the property is less than an adequate return on the amount comparable sites sell for vacant, then (unless the building is demolished) the selling price of the entire property must be reduced to produce a reasonable return based on the reduced price. Again, it is the building that is a liability and can be said to have declined in value; when the building is removed, the value of the property increases, again demonstrating that variations in the value of the property are attributable to changes in the status of the physical improvements.[6]

When the decline in value of the property is attributable to the passage of time (including obsolescence) the decline occurs throughout a time continuum which corresponds with the useful life of the physical improvements. It is true that at a

---

[6] Presumably when the reduction in price for the entire property necessary to provide a market return on the value of the land as vacant equals the demolition cost, the decline in value of the entire property has reached bottom. At that point, an individual would not reduce the price further, but instead demolish the building and sell the land at its vacant-state value, thus recouping the demolition costs; or sell to someone else who then demolishes the building, ending up with an investment of the same amount that he would have made in comparable vacant land. It is very likely, however, that the building would be demolished before it has its maximum impact in diminishing the vacant-state value of the land. In this connection we recognize the gap between the static model of the experts and the dynamics of real world economic activity. Nevertheless, for all the limitations, the expert testimony on which we have relied heavily, provides the best tools for resolving what petitioner aptly describes as an "entirely factual dispute."

certain distant point on this time continuum (20 years hence in the instant case) it is anticipated that the highest and best use of the property will require demolition of the building, and the building (as a result of the demolition costs) will be a liability reducing the vacant-state value of the land. However, in this instance, that time is 20 years into the future, and petitioner has unrealistically accelerated the point on the time continuum when that factor can be realistically expected to exert a significant impact on market values.[7] To the extent that prospective buyers would, as petitioner contends, accelerate the time continuum by 20 years, we believe the reduction must be made in the portion of the purchase price allocable to the building.

Any other result would lead to absurd consequences. Returning to the example, an individual who erected a $2 million building on a $1 million lot would have property worth $3 million, with $1 million being attributable to the building site and $2 million being attributable to the physical improvements. If the entire property were sold a month after the building was completed, under petitioner's theory the purchaser would have a $3 million property, but the amount allocable to the land would be reduced and the amount allocable to the physical improvements would be increased by the present worth of the current estimated costs of demolition. Certainly, if petitioner's theory is correct, the fact that the new building would have a longer useful life than the building in question does not change the principle: it simply changes the period over which the demolition costs must be discounted to produce their present worth.

In addition to this anomaly, it is paradoxical in the extreme to allocate the value between land and a brand new building on the assumption that the new building will be demolished.

---

[7] In fact, it would be virtually impossible to take into account the costs of demolition 20 years hence, since they would be virtually impossible to estimate from the distance of 20 years. The estimate from Harvey Wrecking Co. of Sept. 19, 1968, specifically states that:

"This estimate is based on the current conditions, wage rates and salvage values. We, therefore, reserve the privilege to review this bid *at the time* of the demolition. [Emphasis added.]"

The factors Harvey Wrecking took into account in preparing their estimate make it clear how elastic these estimates could be over a 20-year period. And discounting an elastic figure to present worth does not eliminate the elasticity.

And again, the fact that instead of a new building with a 40- or 50-year useful life, we have an older building with a 30-year or, as in this case, a 20-year useful life, does not affect the principle, only the discount period.

The present case provides a good example of these anomalies. The petitioner's expert prepared his report on the assumption that the most productive use of the property required expenditures of over $1 million to upgrade the existing physical improvements. Shortly after the acquisition of the property by petitioner, the property manager prepared a flyer soliciting tenants for the new building, and the flyer emphasized that the building was to be substantially remodeled and renovated. And substantial renovations were in fact made. The assumptions of respondent's expert, the manner in which the property was marketed, and the renovations made by petitioner are wholly inconsistent with the assumption that demolition expenditures had anything to do with the way they planned to use the building. And we do not believe value would be determined in the market without regard to the economic use to which the property will be put.

Additionally, as respondent points out, petitioner's assumption that demolition costs should be deducted from the land means that the building can never be worth less than the costs of demolition.[8] And to the extent allocation of value is attributable to hypothetical demolition costs, we would also confront the peculiar phenomena that the value allocable to the building will increase in direct proportion with the age of the building and with the estimated costs of demolition.

There is an additional reason why petitioner cannot prevail. The regulations clearly provide that if petitioner acquired the

---

[8] As suggested earlier, we confront something of a zero-sum game. We know the value of the entire property, and the sum of the parts (land and building) must equal the whole. To the extent the value of the land is decreased, there is a commensurate increase in the value of the building. For this reason, many of petitioner's examples corroborating its allocation of values are tautological. Having reduced the land and increased the building by the estimated current demolition costs, the allocation of the income stream from the entire property can be taken apart and put back together again in accordance with this assumption. But as long as the division between land and building totals the value of the entire property (the whole equals the sum of the parts), the same would be true for another set of assumptions. The critical assumption in all this occurs at the very beginning—when the value of the land is reduced and the value of the building increased by the current estimated costs of demolition.

property with intent to demolish the building, the entire basis of the property *plus* demolition costs would be allocated to the land.[9] Sec. 1.165–3(a)(1), Income Tax Regs.

On the other hand, the regulations provide that if petitioner formed a plan of demolition subsequent to the acquisition, an amount equal to the adjusted basis of the building *plus* the net cost of demolition would be available as a deduction under section 165(a) of the Internal Revenue Code of 1954. Sec. 1.165–3(b)(1), Income Tax Regs.[10] If, in allocating basis to the building for purposes of depreciation, we increase the amount so allocated by demolition costs, petitioner would receive a double benefit for the costs of demolition, i.e., an increased depreciation deduction over the useful life of the building *and* a loss deduction at the end of the useful life.

Having determined the value of the land on September 1, 1967, was $1,582,000, we must proceed to determine the value of the entire property. As noted earlier, the parties are not far apart on this issue, petitioner claiming the value of the entire property is $2,170,000, while respondent claims the figure is $2,200,000. In resolving this small difference, we are again guided by the appraisals of the expert witnesses who determined the value of the entire property by resort to income analysis.

Petitioner's expert assumes that alterations to the building would maximize earnings potential and further assumes that such alterations would be made. In addition, he projects income over a remaining useful life of 20 years, which the parties stipulated as the remaining useful life. The valuation of respondent's expert, on the other hand, projects income over a 15-year period without reference to increased earnings resulting from alterations.

After careful consideration of all the relevant factors, we believe the value of the entire property on September 1, 1967, was $2,170,000. Since the value of the land was $1,582,000,

---

[9] If the plan of demolition is conceived prior to acquisition but the building is used in the production of income prior to demolition, a portion of the basis not exceeding the right to receive rentals over the period of intended use may be allocated to the building. Sec. 1.165–3(a)(2)(i), Income Tax Regs.

[10] This Court, however, has held that the demolition losses must be added to the cost basis of new construction. *Estate of Edgar S. Appleby*, 41 B.T.A. 18 (1940), affd. 123 F.2d 700 (2d Cir. 1941); *Henry Phipps Estates*, 5 T.C. 964 (1945).

the value of the building was $588,000. Thus, the proper ratio for determining the basis attributable to the depreciable improvements is the ratio of $588,000 to $2,170,000. Sec. 1.167(a)–5, Income Tax Regs.

*Decision will be entered under Rule 155.*