JAMES D. WYATT AND DONNA K. WYATT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wyatt v. Commissioner
Docket No. 13137-89
United States Tax Court
T.C. Memo 1991-621; 1991 Tax Ct. Memo LEXIS 671; 62 T.C.M. (CCH) 1540; T.C.M. (RIA) 91621; December 16, 1991, Filed *671 Decision will be entered under Rule 155. James J. Everett, for the petitioners. Barbara S. Trethewy, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in, increased interest, and additions to petitioners' Federal income taxes: Interest and additions to tax
Year
Deficieny
Sec. 6621(c)
Sec. 6659
1984
$ 23,689
applicable
$ 6,507
1985
17,999
applicable
5,399
1986
18,135
applicable
5,441
After concessions by the parties, the issues are: (1) Whether petitioners have established the proper basis for their avocado trees and grove improvements for calculation of depreciation and investment tax credit; (2) whether petitioners are liable for additions to tax under section 6659 for valuation overstatement; and (3) whether petitioners are liable for interest on any deficiency at the rate prescribed in section 6621(c) for substantial underpayment due to tax-motivated transaction.
All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT
*672 We incorporate by reference the stipulation of facts and attached exhibits. Petitioners James D. Wyatt (Mr. Wyatt) and Donna K. Wyatt (Mrs. Wyatt) are husband and wife and resided in Scottsdale, Arizona, at the time of the filing of their petition. Petitioners filed joint Federal income tax returns for the years 1984, 1985, and 1986. In December 1984, petitioners purchased a one-fourth interest in an avocado grove, known as the Mountain Meadow Avocado Grove, and surrounding acreage in San Diego County, California. The acquisition included depreciable avocado trees and grove improvements as well as nondepreciable land. Petitioners purchased their one-fourth interest in the property for $ 1,250,000. Petitioners paid $ 75,000 at the time of acquisition and escrowed $ 25,000 for closing and other costs. In addition, petitioner took their one-fourth interest in the property subject to $ 2,152,800 of existing indebtedness securing the property, providing a credit of $ 538,200 toward the purchase price. Petitioners also executed a promissory note in the amount of $ 636,847.05. The total purchase price for the property was $ 5,000,000. The purchase and sales agreement assigns a *673 value of $ 2,600,000 to the avocado trees. Petitioners took depreciation deductions and an investment tax credit based on their allocable share (one-fourth or $ 650,000) of that assigned value for the years at issue. Mr. Wyatt is a businessman who has been involved in many successful investment ventures since 1970. Mr. Wyatt visited and investigated the property prior to purchasing an interest in it. He also investigated the basic nature of avocado farming, the avocado industry, and avocado fruit market conditions. At the time of purchase, the avocado grove improvements consisted of approximately 216 acres of avocado trees and a reservoir, irrigation system, and certain other structures located on this portion of the property. The reservoir was a concrete-lined, manmade structure with a system of sand filters, fertilizer ejectors, pumps, and valves. The grove was irrigated by polyethylene tubing and drip emitters. The water delivery system was a good system well suited for the grove. The property also included a foreman's house in average to good condition and an open work area, sheds, and service area. The grove-improved portion of the property contained several different *674 types of avocado trees. The different types of avocado trees produce fruit that varies in quality and sales price. Many of the avocado trees on the property were Hass trees. Hass avocado trees produce a high quality fruit that brings a higher sales price. The other varieties of trees on the property were Bacon, Fuerte, Reed, and Zutano, all of which, except the Reed variety, yielded lower-priced fruit. A portion of the trees had been affected by phytophtoracinnamomi, or root rot, but the problem had been contained and the disease was not expanding when petitioners purchased the property in 1984. The trees were generally healthy, and the grove was maturing and producing fruit near the industry average on a per-acre basis. At the time of petitioners' purchase, the grove contained nearly 17,000 trees, 64 percent of which were currently producing with the remainder still too young to produce fruit. Arrangements were made with the existing manager to continue to manage the grove operations. At the time of purchase, the property was zoned for light agricultural use, but zoning changes were available. In addition, the property recently was removed from "Agricultural Preserve Zoning." *675 That is, the property was no longer subject to a Williamson Act contract entered into by a previous owner. The Williamson Act, or California Land Conservation Act of 1965, provides for agreements between landowners and a county limiting the use of the land to the production of agricultural commodities in return for preferential tax assessments. It was designed to conserve irreplaceable agricultural lands and to eliminate socio-economic sprawl. A Williamson Act contract has an initial term of no less than 10 years. Each contract provides that on the anniversary date of the contract, a year shall be added to the initial term unless notice of nonrenewal is given. Therefore, the Act continues to govern the property for the 10 years following an election to revoke a Williamson Act contract. The terms of a Williamson Act contract are binding on all successors in interest of the landowner. Since an election had been made by a former owner in 1974 to cancel the contract, the property was no longer covered by the Williamson Act's restrictions at the time of petitioners' purchase. The property is located in a rural, generally mountainous area approximately 3 miles north of the City *676 of Escondido, California. The property is a "mesa" or mountain-top property totaling approximately 670 acres, with topography ranging from steep ravines and mountain ridges to nearly level terrain. The property is located within sight of an interchange onto an interstate highway running near the California coast and connecting with San Diego less than 40 miles away. It is within 3 miles of the City of Escondido that, at the time of acquisition, contained over 75,000 people and was growing at a rate of nearly 2 percent a year. The local area's economic base was diverse and strong. The property was surrounded on three sides by residential neighborhoods. The only drawback for residential construction was the property's steep terrain. However, that characteristic also enhanced its value for residential development by providing dramatic view potential. A subdivision map was in process for the property at the time of acquisition. The property had significant value for residential development at the time of acquisition. Petitioners recognized this and considered subdividing the property within 5 years of their purchase. In December 1984, the value of the property as a whole was *677 $ 5,000,000. The value of the depreciable avocado trees and grove improvements was $ 700,000. OPINION The issues for discussion are: (1) Whether petitioners have established the proper basis for their avocado trees and grove improvements for calculation of depreciation and investment tax credit; (2) whether petitioners are liable for additions to tax under section 6659 for valuation overstatement; and (3) whether petitioners are liable for interest on any deficiency at the rate prescribed in section 6621(c) for substantial underpayment due to a tax motivated transaction. To decide the first issue, we must determine whether petitioners' allocation of purchase price to the avocado trees and grove improvements is in accord with their fair market values. The depreciable basis of purchased property is its cost. Secs. 167(g), 1011, 1012; Weis v. Commissioner, 94 T.C. 473, 482 (1990). When a combination of depreciable and nondepreciable property is acquired for a lump sum, "the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the *678 entire property at that time." Sec. 1.167(a)-5, Income Tax Regs. Therefore, the relevant inquiry is the respective fair market values of the depreciable and nondepreciable property at the acquisition date. Randolph Building Corp. v. Commissioner, 67 T.C. 804, 807 (1977); Weiss v. Commissioner, supra. The question is one of fact, and petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Respondent initially argues that petitioners made no actual investment in the property. If this were the case, depreciation deductions and the investment tax credit should be denied altoghether. We disagree. Petitioners paid $ 75,000 down on the property and escrowed $ 25,000 for closing costs and other items. They took title to the property subject to $ 2,152,800 of existing indebtedness securing the property and were therefore credited with $ 538,200 towards the purchase price. Petitioners also executed a promissory note in the amount of $ 636,847.05 for the balance of the purchase price ($ 75,000 + $ 538,200 + $ 636,847.05 = $ 1,250,047.05). The existing obligations secured by the property and the promissory *679 note were valid, enforceable obligations. In addition, respondent's own expert submitted a report concluding that based on comparable sales, 32 percent of the property was worth $ 1,500,000 without considering the value of the avocado trees and grove improvements. Extrapolating that figure, the value of the whole property would be almost $ 4,700,000, again without improvements. There is no indication that the property was "under water," with nonrecourse debt exceeding the fair market value of the property. Cf. Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). The normal indicia of that type of sham transaction leading us to recharacterize petitioners' promissory note as not real debt is absent. The economic interests of the buyer and seller were actually affected by the purchase and sales agreement. There was no leaseback provision or repurchase agreement. Estate of Franklin, supra. Petitioners had an economic incentive to honor the obligations to protect their interest in the property. We hold that a bona fide purchase and sale occurred for a price of $ 5,000,000 in this case, and that *680 petitioners made an actual investment in the property of $ 1,240,000. The main disagreement between the parties is the fair market value of the avocado trees. Both parties presented experts to testify as to the value of the trees at the time of acquisition. Respondent's expert opined on the value of the avocado trees and grove improvements as a whole. Once again, this Court is faced with the task of resolving differences in the opinions of experts. Once again, we must advise counsel that valuation cases such as this one are better suited for the give and take of the settlement process than adjudication. See Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 451 (1980); Messing v. Commissioner, 48 T.C. 502, 512 (1967). However, since the parties were unable to resolve their differences, the Court must do it for them. We have considered the qualifications and experience of the parties' experts, their particular knowledge and experience in valuing avocado groves, as well as the substance and reasoning of their reports and testimony. We conclude that respondent's expert was more convincing, and hold that the value of the depreciable *681 avocado trees and grove improvements was $ 700,000 as of the acquisition date in December 1984. Buffalo Tool & Die Mfg. Co., supra.
Respondent's expert, Robert L. Graves (Mr.Graves), is a real estate appraiser with 19 years' experience appraising real estate and avocado groves in San Diego County. Mr. Graves concluded that the property's highest and best use was interim use as an avocado grove with future use for residential development. The location of petitioners' property was in a growing community and located on the edge of an interstate highway. The property had good view potential and other characteristics making it desirable for residential development. In addition, just prior to petitioners' purchase, the property had been released from a restricting Williamson Act contract, freeing it for transition to residential zoning. In fact, a subdivision map was already in development. We accept Mr. Graves' conclusion that the purchase price was influenced significantly by the value of the property for future residential real estate development. See Akers v. Commissioner, T.C. Memo 1980-233. Mr. Graves valued the components of petitioners' property *682 with a sales comparison approach. He accumulated data from local area sales of 9 comparable unimproved and 13 comparable avocado-grove improved properties occurring during the same time period as petitioners' acquisition. Based upon this data, a per-acre fair market value estimate was developed for unimproved property equivalent to petitioners' unimproved property. A similar estimate was arrived at for grove-improved property. A residual approach was then used to value the grove improvements. The approach and conclusions drawn were logical, well reasoned, and well documented. All of the comparable sales occurred within a year of petitioners' acquisition. Each property was inspected. Every sale was analyzed for its level of comparability. Variances in exact geographic location, topography, circumstances of the sale, size, and quality of improvements for grove improved property were accounted for in a systematic and logical way. For example, where an unimproved property had topography, location, or development potential that was more or less desirable, the per-acre value was adjusted accordingly. Similarly, the grove-improved comparables were adjusted for the type, age, and *683 condition of the trees, and the quality of the other improvements. In contrast, petitioners' expert, Warren Currier (Mr. Currier), prepared a report, consisting of two letters, commenting on a prior appraisal of the property prepared by the Internal Revenue Service (IRS) and a comparison of two property sales. The IRS report referred to, however, is not in evidence, its author was not at trial, and a critique of it is not useful. Mr. Currier's letter also discussed an "income approach" to value petitioners' grove improvements. Much of the report's reasoning in this vein, however, was conclusory and lacking in substantiation. In addition, while we found petitioners' expert to be very knowledgeable about avocados, he was, by his own admission, not a real estate appraiser. See Hurd v. Commissioner, T.C. Memo 1978-113. Moreover, the two comparable sales cited by Mr. Currier are insufficient to repudiate Mr. Graves' conclusions. Mr. Currier's testimony commenting on Mr. Graves' report was confusing and superficial. See Walsch v. Commissioner, T.C. Memo 1974-167. Therefore, we will accept respondent's expert's valuation of petitioners' *684 avocado trees and grove improvements of $ 700,000. We also must decide whether petitioners are liable under section 6659 for valuation overstatement, and whether they are liable for interest at the rate prescribed in section 6621(c) on tax-motivated transactions. Section 6695(c) defines a valuation overstatement and states that a valuation overstatement exists "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis." If a valuation overstatement exists, then the amount added to the tax is the underpayment attributable to the valuation overstatement multiplied by the "applicable percentage." Sec. 6695(a). The applicable percentage in the case where the valuation overstatement exceeds 250 percent of the actual value is 30 percent. We have held that the true value of petitioners' depreciable grove improvements was one-fourth of $ 700,000, not one-fourth of $ 2,600,000 that petitioners used in their calculation of the investment tax credit and depreciation deductions. The valuation overstatement exceeds 250 percent. Therefore, we hold that *685 petitioners are liable for additions to tax in the amount of 30 percent of the underpayment due to the valuation overstatement of their depreciable grove improvements. Nielsen v. Commissioner, 87 T.C. 779 (1986). Section 6621(c) applies an increased interest rate to deficiencies due which are attributable tax-motivated transactions. Section 6621(c)(3)(A)(i) includes any valuation overstatement within the definition of a tax-motivated transaction. We have held that petitioners are liable for additions to tax for a valuation overstatement under section 6659. Therefore, we hold that petitioners also are liable for the increased interest rate prescribed under section 6621(c). Decision will be entered under Rule 155.