T.C. Memo. 1997-530


UNITED STATES TAX COURT


ELI T. SLEIMAN, JR. AND JANIE L. SLEIMAN, ET AL,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 12663-95, 12664-95,     Filed November 24, 1997.
            12665-95.


<u>Robert S. Bernstein</u> and <u>Scott D. Richburg</u>, for petitioners.

<u>Robert W. Dillard</u> and <u>Stephen R. Takeuchi</u>, for respondent.


---

[1]     Cases of the following petitioners are consolidated herewith for purposes of trial, briefing, and opinion:  Peter D. Sleiman and Carolina T. Sleiman, docket No. 12664-95; and Anthony T. Sleiman and Bonnie C. Sleiman, docket No. 12665-95.

MEMORANDUM OPINION

DINAN, Special Trial Judge:  These consolidated cases were heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182.[2]

Respondent determined deficiencies in petitioners' Federal income taxes and accuracy-related penalties pursuant to section 6662(a) as follows:

Eli T. Sleiman, Jr. and Janie L. Sleiman, docket No. 12663-95

| Year | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|
| 1992 | $3,544 | $709 |

Peter D. Sleiman and Carolina T. Sleiman, docket No. 12664-95

| Year | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|
| 1991 | $3,332 | $666 |
| 1992 | 4,286 | 857 |

Anthony T. Sleiman and Bonnie C. Sleiman, docket No. 12665-95

| Year | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|
| 1991 | $2,049 | $410 |
| 1992 | 4,174 | 835 |

After concessions by the parties, the issues remaining for decision are:  (1) Whether petitioners Eli T. Sleiman and Peter

---

[2]    Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

D. Sleiman are entitled to increase their respective stock bases in their wholly owned S corporations, Real Estate Equities, Inc. (REE) and Triple Net Equities, Inc. (TNE), by the principal amounts of bank loans to REE and TNE which they personally guaranteed; (2) whether respondent properly reallocated Miramar Equities, Inc.'s (ME's) bases in its land and depreciable real property; (3) the proper amortization period for a loan commitment fee and attorney's fees incurred by ME during 1992 in connection with obtaining a loan; (4) whether REE and ME are entitled to deductions pursuant to section 164(a) for taxes incurred in connection with recording mortgages in the State of Florida; and (5) whether REE and TNE are required to report tenant improvements as rental income.

Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioners resided in Jacksonville, Florida, on the date their respective petitions were filed.

Petitioners Eli T. Sleiman (Eli), Peter D. Sleiman (Peter), and Anthony T. Sleiman (Anthony) are brothers. All three participated with a fourth brother, Joseph E. Sleiman, who is not a party to these cases, in various real estate development projects in northern Florida.

The brothers ordinarily divided up the different aspects of their real estate development activities among themselves. Eli is a licensed contractor who oversees the construction

activities. Peter is an attorney admitted to practice in the State of Florida. He handles all of the real estate development paperwork, including the negotiations of financing and leasing arrangements. Anthony is responsible for locating desirable property sites. Respondent's adjustments that remain in issue relate to three real estate development projects that Eli, Peter, and Anthony operated through three corporations, REE, TNE, and ME, each of which had elected to be treated as an S corporation under section 1362(a).

REE

During 1991 and 1992, Eli was the sole shareholder of REE, which was incorporated on August 21, 1991, in the State of Florida. REE was organized to purchase and develop property and to lease it to Blockbuster Video, Inc. (Blockbuster), which had entered into a lease agreement with Eli, dated July 30, 1991. Eli later assigned the lease to REE.[3]

On October 23, 1991, REE purchased property located at 910 Dunn Avenue (the Dunn property) in Jacksonville, Florida. The Dunn property was formerly the site of a gasoline station and required substantial environmental remediation due to land contamination problems.

---

[3] In their reply brief, petitioners object to respondent's proposed finding of this fact on the ground that respondent failed to prove that Eli assigned the lease to REE. Petitioners, however, did not submit any evidence that supports their objection. After reviewing the record, the Court is not persuaded that such an assignment did not in fact occur.

REE financed its purchase of the Dunn property and its construction of the building thereon with a 1-year construction loan from SouthTrust Bank of Alabama, N.A. (SouthTrust Bank) in the amount of $450,000. The mortgage note required REE to make monthly payments of interest, but not principal, computed at a rate of 3\4 percent above SouthTrust Bank's "base rate". The principal balance was due and payable on October 23, 1992. REE's closing costs of the mortgage note included a loan commitment fee in the amount of $4,500.

REE and SouthTrust Bank also executed a construction loan agreement on October 23, 1991, which provided for the loan proceeds to be advanced in two installments. Under the agreement, the first installment was to be advanced for the purchase of the Dunn property, and the second installment was to be advanced upon the completion of the improvements.

REE's mortgage note was secured under a mortgage and security agreement by the Dunn property and its improvements and REE's interest in the Blockbuster lease. Hollis Wilson Crenshaw, Inc., an independent appraiser, submitted an appraisal to SouthTrust Bank that valued the Dunn property with the Blockbuster lease at $870,000. The mortgage and security agreement also provided that REE was ultimately responsible for the costs of any remedial action required to correct environmental problems. Although he was not a direct borrower, Eli personally guaranteed the mortgage note.

On December 4, 1992, REE received a commitment from SouthTrust Bank for permanent financing of the Dunn property. On December 21, 1992, REE and SouthTrust Bank executed a renewal mortgage note that provided for REE to make monthly interest and principal payments through the maturity date of October 23, 2002, with interest computed at a rate of 8.02 percent for the first 5 years and thereafter adjusted in accordance with the average yield of the 5-year Treasury note. The renewal mortgage note was made effective as of October 23, 1992. REE's closing costs of the renewal mortgage note included a loan commitment fee in the amount of $2,250.

The parties also executed a mortgage modification agreement on December 21, 1992, which reflected REE's release from the original mortgage note by its execution of the renewal mortgage note. Eli also consented to have his personal guaranty extended to cover the renewal mortgage note.

REE made all of the payments on its construction loan and its permanent loan from SouthTrust Bank. Eli was not called upon to pay any amount on his personal guaranties during 1991 and 1992.

TNE

During 1991 and 1992, Peter was the sole shareholder of TNE, which was incorporated on August 5, 1991, in the State of Florida. Like REE, TNE was organized to purchase and develop property and lease it to Blockbuster, which had entered into a

lease agreement with Peter and his wife, Carol T. Sleiman, dated March 25, 1991. Peter and Carol Sleiman later assigned the Blockbuster lease to TNE.

On September 4, 1991, TNE purchased property located on Roosevelt Boulevard (the Roosevelt property) in Jacksonville, Florida, as the site for the Blockbuster store. Like REE's Dunn property, a gasoline station had been operated on the site in prior years. As early as 1987, the State of Florida determined that the Roosevelt property had been contaminated by the gasoline station and thereafter designated the property as eligible to participate in its Early Detection Incentive (EDI) environmental cleanup program. The EDI program subsidized eligible property owners to either clean up contaminated property with government resources or to reimburse owners who paid for the clean up costs themselves. Under the EDI program, the Roosevelt property's prior owners had the gasoline tanks, distribution lines, and a large amount of contaminated soil removed from the site. TNE acquired the right to further participate in the EDI program when it purchased the property.

TNE financed the purchase of the Roosevelt property and its construction of the building thereon with loans from Peter's related business entities. Although Peter could not recall at trial where the funds came from, TNE's records show that it received loans during 1991 from Duval Royal Investment, Inc. and Brothers Five of Jacksonville, Ltd.

In order to pay off its debt to its related entities, TNE obtained a loan from SouthTrust Bank in the amount of $450,000 on October 2, 1992. TNE's promissory note was secured under a mortgage and security agreement by the Roosevelt property and its improvements, TNE's interest in the Blockbuster lease, and TNE's right to participate in Florida's EDI program. Although he was not a direct borrower, Peter personally guaranteed the loan.

TNE made all of the payments on its October 2, 1992, SouthTrust Bank loan. Peter was not called upon to pay any amount with respect to his personal guarantee during 1992.

ME

During 1991 and 1992, Anthony was the sole shareholder of ME, which was incorporated on September 6, 1991, in the State of Florida. ME was organized to purchase, renovate, and lease the Miramar shopping center in Jacksonville, Florida.

ME purchased the Miramar shopping center from Country, Inc., on July 15, 1992, for $745,000. In the purchase and sale agreement, the parties allocated $60,000 of the purchase price to land and $685,000 to buildings.

ME financed the purchase of the Miramar shopping center and the renovations to be made thereon with a 1-year construction loan from SouthTrust Bank in the amount of $1,500,000. The promissory note required ME to make monthly payments of interest, but not principal, computed at a rate of 3\4 percent above SouthTrust Bank's "base rate". The principal balance was to be

due and payable on June 30, 1993.  ME's closing costs of the promissory note included a loan commitment fee in the amount of $15,000.

With respect to the construction loan, ME and SouthTrust Bank executed an agreement, dated July 15, 1992, which provided that the loan proceeds would be advanced in two installments. Under the agreement, the first installment was to be advanced for the acquisition of the shopping center and the second installment was to be advanced upon the completion of the improvements and the subsequent delivery of tenant leases that showed a minimum rental income flow.

ME's promissory note was secured under a mortgage and security agreement by the shopping center and ME's interest in the shopping center leases.  Anthony personally guaranteed the promissory note.

On June 3, 1993, ME received a commitment from SouthTrust Bank for permanent financing for the Miramar shopping center project.  On July 20, 1993, ME and SouthTrust Bank executed a renewal promissory note that provided for ME to make monthly principal and interest payments through the maturity date of July, 20, 2003, with interest computed at a rate of 7.53 percent for the first 5 years and thereafter adjusted in accordance with the average yield on the 5-year Treasury note.  The renewal promissory note also required ME to pay a prepayment premium for the amounts of any prepayments in the first 3 years of the

permanent loan's term.  ME's closing costs of the renewal
promissory note included a loan commitment fee in the amount of
$5,000.

The parties modified and extended the original mortgage and
security agreement to have it serve as security for the renewal
promissory note.  Anthony's personal guaranty was also extended
to cover the renewal promissory note.

Stock Basis

The first issue for decision is whether Eli and Peter are
entitled to increase their respective bases in the stock of REE
and TNE by the principal amounts of the loans from SouthTrust
Bank to REE and TNE which they personally guaranteed.

Respondent determined in the statutory notices of deficiency
that Peter's and Eli's distributions from TNE and REE exceeded
their adjusted bases in the stock of TNE and REE and that they
are required to recognize capital gain on the amounts of those
excesses.[4]

Respondent's determinations in the statutory notices of
deficiency are presumed to be correct, and petitioners bear the

---

[4] As a result of the stipulations of the parties, the
amounts of the distributions received by Peter and Eli during
1992 are greater than the amounts determined by respondent.  The
stipulations provide that Eli received distributions from REE in
the amount of $55,400 and Peter received distributions from TNE
in the amount of $119,397.42 during 1992.  As stated above, we
incorporate such stipulations into our findings of fact and
herein instruct the parties to use such greater amounts of the
distributions in their Rule 155 computations.

burden of proving otherwise. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

Section 1368(b)(2) provides that if the amount of a distribution of property made by an S corporation to a shareholder exceeds the adjusted basis of the shareholder's stock in the S corporation, such excess is treated as gain from the sale or exchange of property in the taxable year of the distribution. The amount of the gain, if any, that Peter and Eli are required to recognize because of the distributions they received during 1992, therefore, depends on their adjusted bases in the stock of TNE and REE at the end of 1992.

Petitioners contend that respondent erred by not allowing Eli and Peter to increase their adjusted bases in their stock in REE and TNE by the $450,000 loans from SouthTrust Bank to REE and TNE. They argue that, in substance, the loan transactions constitute loans to Eli and Peter followed by capital contributions by them of the proceeds to REE and TNE.

Respondent argues that petitioners are bound by the form of their transactions. Respondent further argues that if the Court does consider petitioners' substance over form argument, the transactions do not constitute capital contributions because Eli and Peter did not make an economic outlay in connection with their guarantees.

Section 1012 provides that the basis of property is the cost of the property. A shareholder's basis in his shares of

corporate stock is equal to the amount paid for the stock. Estate of Leavitt v. Commissioner, 90 T.C. 206, 212 (1988), affd. 875 F.2d 420 (4th Cir. 1989); Uri v. Commissioner, T.C. Memo. 1989-58, affd. 949 F.2d 371 (10th Cir. 1991); sec. 1.1012-1(a), Income Tax Regs.

Section 1016(a)(1) generally provides that the basis of property shall be adjusted for items properly chargeable to a capital account.  A shareholder's basis in the shares of stock of a corporation is increased by any additional contributions to the capital of the corporation made after the acquisition of the shares.  Sec. 1.118-1, Income Tax Regs.[5]  The resolution of this issue depends on whether Eli's and Peter's personal guaranties may be treated as capital contributions which increase their adjusted bases in their shares of stock in REE and TNE.

Ordinarily, taxpayers are bound by the form of the transaction they have chosen and may not in hindsight recast the transaction to obtain tax advantages.  Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579-580 (1977); Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974).

After reviewing the loan documents submitted into evidence in these cases, and having considered the testimony of Peter

---

[5]     This rule applies in addition to the basis adjustments specific to S corporation shareholders.  Sec. 1.1367-1(a)(2), Income Tax Regs.; see secs. 1016(a)(17), 1367(a).

Sleiman and SouthTrust Bank's officers, we find that the substance of each loan is consistent with its form. First, as discussed infra, the loans from SouthTrust Bank to REE and TNE do not lack economic substance. Second, REE and TNE did not treat the loan proceeds as contributions to capital by Peter and Eli on their own books and records. Rather, they recorded the loans from SouthTrust Bank as liabilities owed by REE and TNE to SouthTrust Bank.

Petitioners argue that SouthTrust Bank in substance relied primarily on Eli's and Peter's personal guaranties as security for the loans rather than the assets listed in the mortgage and security agreements. We reject petitioners' attempts to disregard the value of the properties owned by REE and TNE and used as collateral for their loans. In addition to the value of the land and improvements, the Blockbuster leases provide ample cash-flow to service the loans. Contrary to petitioners' contentions, we find that SouthTrust Bank took into account the risks associated with the contamination of the land supporting the loan by conditioning its loan commitments on its review of environmental audits of the land. SouthTrust Bank also minimized its economic exposure to future environmental problems in the mortgage and security agreements. We find that petitioners have failed to prove that the loans to REE and TNE lack economic substance.

Petitioners contend that this case is controlled by <u>Selfe v. United States</u>, 778 F.2d 769 (11th Cir. 1985). In <u>Selfe</u>, the United States Court of Appeals for the Eleventh Circuit indicated that the shareholder's guaranty of an S corporation loan could increase the shareholder's basis even though the shareholder had not satisfied any of the obligation. <u>Id.</u> at 774. The court remanded the case to the District Court for it to decide whether the taxpayer's guaranty amounted to either an equity investment in or a shareholder loan to the corporation. <u>Id.</u> at 775. It instructed the District Court to determine whether the loan in question was in substance a loan to the shareholder rather than to the corporation. <u>Id.</u>

Petitioners' reliance on <u>Selfe</u> is misplaced. In <u>Selfe</u>, the taxpayer started a business and obtained a loan which was secured by her own property. The taxpayer later incorporated the business under subchapter S and converted the loan into a corporate obligation, which she guaranteed and which continued to be secured by her own property. <u>Id.</u> at 770. The instant cases are distinguishable on their facts from <u>Selfe</u> because SouthTrust Bank made the original loans to REE and TNE, not to Eli and Peter, and the collateral for the loans are REE's and TNE's assets, not Eli's and Peter's. See <u>Wise v. Commissioner</u>, T.C. Memo. 1997-135 (also appealable to the Eleventh Circuit).

Moreover, it is well established that a shareholder cannot increase his or her basis in an S corporation's stock absent an

- 15 -

economic outlay by the shareholder.  Reser v. Commissioner, 112 F.3d 1258, 1264 (5th Cir. 1997), affg. on this issue T.C. Memo. 1995-572; Goatcher v. United States, 944 F.2d 747, 751 (10th Cir. 1991); Harris v. United States, 902 F.2d 439, 445 (5th Cir. 1990); Estate of Leavitt v. Commissioner, 875 F.2d at 422; Selfe v. Commissioner, supra at 772.

We find that Eli's and Peter's wholly unperformed guaranties in these cases do not meet the requirement that a shareholder make an economic outlay in order to increase his basis in his stock.  As explained above, these guaranties were not tantamount to equity investments nor to shareholder loans to the corporations.  Thus, it is only the actual payment by the guarantor of the guarantied obligation that constitutes an economic outlay, not the guaranty itself.  Estate of Leavitt v. Commissioner, 875 F.2d at 422-423; Underwood v. Commissioner, 63 T.C. 468, 476 (1975), affd. 535 F.2d 309, 312 (5th Cir. 1976); Perry v. Commissioner, 47 T.C. 159, 163-164 (1966), affd. 392 F.2d 458 (8th Cir. 1968).  In these cases, Eli and Peter did not pay any of the loans that they guaranteed and therefore did not increase their capital investments in REE and TNE.  Accordingly, we hold that Eli and Peter may not increase their respective bases in REE and TNE by the principal amounts of the South Bank Trust loans.  Respondent's determinations are sustained on this issue.

Allocation of Basis

The second issue for decision is whether respondent properly reallocated ME's bases in its land and depreciable real property.

On its 1992 return, ME claimed a basis in land in the amount of $60,000, and a basis in nonresidential real property in the amount of $945,286.23.[6] Respondent disallowed ME's claimed bases and determined that $377,735 is properly allocated to land. As a result of the reallocation, respondent disallowed $11,615 of ME's claimed depreciation deduction.

In their post-trial briefs, the parties address only the proper allocation of the purchase price of the Miramar shopping center that was listed in the purchase and sale agreement. Respondent maintains that $377,735 of the $745,000 purchase price is properly allocated to land. Petitioners maintain that only $60,000 of the purchase price is properly allocated to land.

When a combination of depreciable and nondepreciable property is purchased for a lump sum, the lump sum must be apportioned between the two types of property to determine their respective costs. In making this allocation, section 1.167(a)-5, Income Tax Regs., provides:

---

[6] Apart from the purchase agreement, there is no evidence in the record as to what portion of the claimed basis in nonresidential real property was claimed as ME's purchase price for the shopping center's existing buildings as distinct from its capital expenditures incurred during 1992 for renovations. Based on the amounts listed in the purchase agreement, we find that $685,000 of the claimed basis was claimed as purchase price and the remainder was claimed as capital expenditures.

    In the case of the acquisition on or after March
1, 1913, of a combination of depreciable and
nondepreciable property for a lump sum, as for example,
buildings and land, the basis for depreciation cannot
exceed an amount which bears the same proportion to the
lump sum as the value of the depreciable property at
the time of acquisition bears to the value of the
entire property at that time. * * *

Thus, the relevant inquiry is the respective fair market values of the depreciable and nondepreciable property at the time of acquisition. Weis v. Commissioner, 94 T.C. 473, 482-483 (1990); Randolph Building Corp. v. Commissioner, 67 T.C. 804, 807 (1977). Petitioners bear the burden of proving that respondent's allocation is incorrect. Rule 142(a); see Elliott v. Commissioner, 40 T.C. 304, 313 (1963).

Petitioners rely on the allocation agreed to by ME and Country, Inc., the seller of the shopping center. They argue that the allocation in the purchase and sale agreement is determinative of the property's fair market value at the time of acquisition because the transaction was conducted at arm's length. Respondent cites the value of the land as estimated in an independent appraisal report and as determined by the Duval County property tax appraiser's office in arguing that ME's allocation is improper.

Petitioners have introduced no evidence, other than the purchase and sale agreement, that supports the allocation claimed on ME's return. In contrast, two separate appraisals, discussed infra, convince us that the value of the land constitutes a

greater percentage of the value of the entire property than the percentage allocated in the agreement. We find that respondent correctly determined that the amount reported by ME as its basis in land on its 1992 Federal income tax return is incorrect. We must therefore decide whether petitioners have proved that respondent's reallocation is erroneous.

Hollis Wilson Crenshaw, Inc. prepared an appraisal of ME's shopping center proposal for SouthTrust Bank. It estimated the value of the entire property at $2,800,000, and the value of the land at $575,000. The estimates, however, include the value of: (1) An office building (the Parrish building) on another plot of land located adjacent to the shopping center; and (2) proposed renovations to the existing buildings. Therefore, the appraisal does not reflect the fair market value of the shopping center's land and buildings at the time of acquisition.

Likewise, the parties' stipulation that the Duval County appraiser's office appraised the value of the land at $529,688 as of January 25, 1993, is not determinative. An estimated value of the land absent an estimated value of the buildings thereon does not allow us to make a conclusive apportionment of the shopping center's purchase price under section 1.167-5(a), Income Tax Regs.

In addition, ME's records show an entry on December 31, 1992, in the amount of $77,054 for land improvements, which amount is not reflected on its return. Petitioners have also not

established whether the Parrish building was purchased during 1992 and, if so, for how much. They have failed to address whether or not these amounts should be taken into account in apportioning the value of the shopping center between land and depreciable property.

After reviewing the record, we find that petitioners have failed to meet their burden of proving that respondent's reallocation of ME's basis in land and depreciable real property is erroneous. Rule 142(a). The evidence does not show that the proportionate value of the shopping center's land acquired by ME during 1992 is accurately reflected in the purchase and sale agreement. Due to their failure to produce probative evidence concerning the value of the property at the time of acquisition, petitioners have not carried their burden of showing error in respondent's allocation. Among other things, petitioners have failed to establish whether ME's postacquisition improvements or its costs of acquiring the Parrish building should be taken into account. We hold that respondent must be sustained on this issue.

Amortization Period

The third issue for decision is the proper amortization period for loan commitment fees and attorney's fees incurred by ME during 1992 to obtain a construction loan.

As part of the closing costs of its $1,500,000 construction loan from SouthTrust Bank, ME was required to pay a loan commitment fee in the amount of $15,000. ME also incurred attorney's fees in the amount $6,450 to obtain the construction loan.

On its 1992 return, ME claimed the fees as prepaid mortgage expenses and amortized them over a 1-year period,[7] which resulted in a claimed amortization deduction in the amount of $10,475. In the statutory notice of deficiency, respondent determined that the fees were properly amortized over an 11-year period, which includes the 1-year period of the construction loan and the 10-year period of the permanent loan, and disallowed $9,500 of the claimed amortization deduction.

Amounts paid for services rendered in connection with a loan constitute capital expenditures which must be amortized over the term of the loan. Lay v. Commissioner, 69 T.C. 421, 437-440

---

[7] The difference, in the amount of $500, between the amortizable amount of fees stipulated to by the parties, $21,450, and the amortizable amount claimed on ME's return, $20,950, is apparently attributable to an increase in the amount of allowable attorney's fees.

(1977); Enoch v. Commissioner, 57 T.C. 781, 794-795 (1972); Lovejoy v. Commissioner, 18 B.T.A. 1179 (1930).

Respondent's position is that ME is required to amortize the fees over an 11-year period because that is the definite period of the loan. Respondent argues that we should view the construction loan and the permanent loan from SouthTrust Bank as a single loan. Petitioners counter that the two loans were properly treated as separate loans for purposes of amortizing the fees because the loans were bargained for separately and contain different material terms.

We agree with petitioners on this issue. The instant case is distinguishable on its facts from the cases cited by respondent. See Wilkerson v. Commissioner, 70 T.C. 240 (1978), revd. on another issue 655 F.2d 980 (9th Cir. 1981); Lay v. Commissioner, supra; Williams v. Commissioner, T.C. Memo. 1981-643. Unlike those cases, ME's original loan documents do not refer to the permanent loan or otherwise indicate that it had bargained for permanent financing at the time it obligated itself under the construction loan. Rather, it separately negotiated and obtained a commitment for permanent financing from SouthTrust Bank less than a month before the due date of the construction loan. ME was also required to pay an additional commitment fee in the amount of $5,000 for its permanent loan.

Respondent points out that the permanent loan documents include words such as "renewal", "extension", "modification", and

"reaffirmation", and that both loans were obtained from the same lender.  However, the material terms of the two loans, such as the interest rates, prepayment premiums, and repayment periods are significantly different.  The requirement of an additional commitment fee further convinces us that the permanent loan constituted a separate obligation on behalf of ME.  Moreover, the fact that SouthTrust Bank was the lender of each loan is not determinative of our decision.  See Buddy Schoellkopf Prods., Inc. v. Commissioner, 65 T.C. 640, 648-650 (1975).

After examining the material terms contained in the loan documents, in lieu of relying merely on their labels, we find that the construction loan and the permanent loan are separate loans.  We therefore hold that ME properly amortized its loan commitment fee and attorney's fees over the 1-year period of its construction loan.

Taxes

The fourth issue for decision is whether REE and ME are entitled to deductions pursuant to section 164(a) for certain taxes incurred in connection with recording mortgages in the State of Florida.

REE and ME incurred the following amounts of intangible personal property taxes and documentary stamp taxes during 1992:

| S Corporation | Intangible Personal Property Tax | Documentary Stamp Tax |
|---|---|---|
| REE | $ 900 | $1,440 |
| ME | 3,000 | 4,800 |

The intangible personal property tax is levied against notes, bonds, and other obligations for the payment of money which are secured by a mortgage, deed of trust, or other lien upon real property situated in the State of Florida.  Fla. Stat. ch. 199.133(1) (1989).  The documentary stamp tax is levied on mortgages, trust deeds, or other evidences of indebtedness filed or recorded in the State of Florida.  Fla. Stat. ch. 201.08(1) (1989).

In the statutory notices of deficiency, respondent disallowed REE's and ME's claimed deductions for taxes on the ground that the taxes constituted capital expenditures.

Section 164(a) provides:

SEC. 164.  TAXES.

(a)  General Rule.--Except as otherwise provided in this section, the following taxes shall be allowed as a deduction for the taxable year within which paid or accrued:

(1)  State and local, and foreign, real property taxes.

(2)  State and local personal property taxes.

(3)  State and local, and foreign, income, war profits, and excess profits taxes.

(4)  The GST tax imposed on income distributions.

(5)  The environmental tax imposed by section 59A.

In addition, there shall be allowed as a deduction State and local, and foreign, taxes not described in the preceding sentence which are paid or accrued within the taxable year in carrying on a trade or business or an activity described in section 212 (relating to expenses for production of income).  Notwithstanding the preceding sentence, any tax (not described in the first sentence of this subsection) which is paid or accrued by the taxpayer in connection with

an acquisition or disposition of property shall be treated as part of the cost of the acquired property or, in the case of a disposition, as a reduction in the amount realized on the disposition.

The parties agree that the intangible personal property taxes and documentary stamp taxes incurred by REE and ME are allowable as deductions within the purview of the second sentence of section 164(a). They disagree, however, as to whether the last sentence of section 164(a) requires the amounts to be capitalized.

The last sentence of section 164(a) was added by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 134(a)(2), 100 Stat. 2085, 2116. According to the conference report, there previously was uncertainty as to whether certain taxes incurred in a trade or business or an income-producing activity could be deducted under section 164 or had to be capitalized under former section 189 or section 263. The new provision was added to make it clear that State, local, or foreign taxes (other than the taxes enumerated in section 164(a)) that are incurred in a trade or business or in an income-producing activity and that are connected with the acquisition or disposition of property are to be capitalized. H. Conf. Rept. 99-841 (Vol. 2), at II-20 (1986), 1986-3 C.B. (Vol. 4) 20.

Respondent's position is that the taxes incurred by REE and ME must be capitalized as part of the cost of the acquired properties because they were incurred in connection with the

acquisition of properties listed as collateral in the recorded mortgages.  Petitioners' position is that the taxes in issue are deductible under the second sentence of section 164(a).  They argue that REE and ME are not required to capitalize the taxes in issue because they were incurred in connection with the acquisition of the construction loans and not the acquisition of the properties.  For reasons outlined infra, we disagree with both respondent's and petitioners' positions.

The parties have not referred us to, and we have not otherwise found, any cases or legislative history which directly address the scope of the phrase "in connection with an acquisition of property" as it is used in the third sentence of section 164(a).  After careful consideration, we conclude that the taxes in issue were more closely incurred in connection with obtaining the construction loans than in acquiring the real properties and may be amortized over the definite terms of the construction loans.

First, the Florida taxes in issue are levied upon the amount borrowed by the taxpayer, not the value of the property which secures the obligation.  Second, the amounts of the taxes in issue were treated as closing costs of the construction loans by REE, ME, and SouthTrust Bank.  The taxes reduced the principal amounts of loan proceeds receivable by REE and ME; thus the taxes constitute a cost of obtaining the loan proceeds.  Third, the loan proceeds were only partly advanced for the purchase of the

real properties.  The remaining amounts were lent and borrowed for construction and renovation activities.  Finally, our interpretation of the third sentence of section 164(a) is consistent with our holding with respect to ME's loan commitment fee and attorney's fees, supra, in that costs incurred in connection with obtaining a loan should be amortized over the definite term of the loan in lieu of being currently deductible or depreciable over the useful life of the property acquired with the loan proceeds.  Cf. Anover Realty Corp. v. Commissioner, 33 T.C. 671, 674-675 (1960).

We hold that REE and ME are required to amortize the taxes in issue over the definite terms of their construction loans.[8]

Rental Income

The fifth issue for decision is whether REE and TNE are required to report tenant improvements as rental income.

Under the lease agreements with Blockbuster, REE and TNE were responsible for purchasing and installing Blockbuster's standard carpeting.  Contrary to the lease agreements, however, Blockbuster purchased and installed the carpeting at both the Dunn and Roosevelt properties at costs of $11,020.43 and $10,023.31, respectively.

---

[8] For reasons akin to our findings with respect to the amortization period for ME's construction loan commitment fee and related attorney's fees, we find that REE's construction and permanent loans constitute separate loans for purposes of amortization.

In the case of the Dunn property, Blockbuster deducted $11,020.43 from its rent due under the lease agreement. REE reported $628.43 of the $11,020.43 as rental income on its 1992 return. In the statutory notice of deficiency, respondent increased REE's rental income by $10,392, the amount incurred by Blockbuster for carpeting costs that REE did not report as rental income.

In the case of the Roosevelt property, Blockbuster deducted $10,023.31 from its rent due under the lease agreement. TNE reported such amount as rental income on its 1991 return. TNE also claimed a deduction in the amount of $10,023.31 as a repairs expense. Respondent disallowed the claimed deduction and determined that the costs were capital expenditures that were properly added to TNE's basis in the Roosevelt property.

Section 61 defines gross income to mean all income from whatever source derived, including rents. Sec. 61(a)(5). If a lessee places improvements on real estate which constitute in whole or part a substitute for rent, such improvements constitute rental income to the lessor. Sec. 1.61-8(c), Income Tax Regs. Whether or not improvements made by a lessee result in rental income to the lessor in a particular case depends upon the intention of the parties, which may be indicated either by the terms of the lease or by the surrounding circumstances. Id.

The statements accompanying the rent checks to REE and TNE include credits for the amounts incurred by Blockbuster for the

carpeting.  The credits are described in the statements as reimbursements for carpet costs.  In addition, Peter responded as follows to his attorney's question at trial:

Q  The scheduled rent -- monthly rent payments that were scheduled under the lease -- you reached an agreement with them that the scheduled rent payments would be reduced or eliminated until they recouped back the cost that they laid out for the carpet?

A  That's -- in essence, that's correct.

Notwithstanding the foregoing, petitioners argue that the amounts incurred by Blockbuster provided no economic benefit to REE and TNE and therefore do not constitute gross income to REE and TNE because Blockbuster is the owner of the carpeting pursuant to oral agreements.

Peter's self-serving testimony on this matter was indefinite and corroborated only by a letter, dated 2 years after the carpeting was installed, from a Blockbuster representative who stated that "to the best of [his] actual knowledge" that Blockbuster owns the carpeting in its video stores.  The letter does not refer to REE, TNE, or the oral agreements under which petitioners argue that Blockbuster claims ownership of carpeting. This letter has little, if any, probative value with respect to REE's and TNE's cases.

Under the circumstances of these cases, we find that the carpeting constitutes improvements to the real properties owned

by REE and TNE, made in lieu of rent payments otherwise payable under the lease agreements.  Petitioners have not explained why REE and TNE would need to credit Blockbuster's rent with the costs incurred for the carpeting if such costs were not incurred as improvements to REE's and TNE's properties.  Petitioners' scenario would result in a double benefit to Blockbuster for the costs incurred; ownership of the carpeting plus reductions in rent.

We hold that REE and TNE must include in gross income the costs of the carpeting incurred by Blockbuster and credited against its rents payable to REE and TNE.

With regard to REE's claimed deduction for the cost of the carpeting as a repairs expense, section 263 provides that no deduction shall be allowed for capital expenditures.  LaPoint v. Commissioner, 94 T.C. 733, 735 (1990).  Capital expenditures include amounts paid or incurred which add to the value or substantially prolong the useful life of the property.  Sec. 1.263(a)-1(b), Income Tax Regs.  In contrast, amounts paid or incurred for incidental repairs or maintenance are currently deductible if they neither materially add to the value of the property nor appreciably prolong the property's useful life.  Sec. 1.162-4, Income Tax Regs.  Since each case turns on its special facts, the distinctions between current expenses and capital expenditures are those of degree and not of kind.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 86 (1992).  The

burden of clearly showing the right to the claimed deduction is on petitioners.  Id. at 84.

This Court has repeatedly held that costs incurred for carpeting generally constitute capital expenditures.  LaPoint v. Commissioner, supra; Otis v. Commissioner, 73 T.C. 671, 674 (1980); Matlock v. Commissioner, T.C. Memo. 1992-324. Petitioners appear to have abandoned the position claimed on REE's return, since they did not address the deductibility of the carpeting costs in their trial memorandum or their briefs.  We find that they have failed to prove that REE is entitled to its claimed repairs expense deduction.  We hold that REE must capitalize the carpeting costs incurred by Blockbuster as part of its basis in the Dunn property.  Likewise, we hold that TNE must increase its basis in the Roosevelt property by the carpeting costs incurred by Blockbuster on its behalf.

To reflect the foregoing,

Decisions will be entered under Rule 155.